UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| **LAUGER COMPANIES, INC.,** | * | CIVIL ACTION |
| Plaintiff, | * | No. 6:16-cv-00011 |
| | * | |
| versus | * | |
| | * | |
| **MID-CONTINENT CASUALTY CO.** | * | |
| Defendant. | * | A JURY IS DEMANDED |

**************************************

## LAUGER COMPANIES' MOTION FOR SUMMARY JUDGMENT

Pursuant to the Court's scheduling order (Doc. 29), Lauger Companies moves for summary judgment on its insurance-coverage and attorney's fee claims against Mid-Continent Casualty Company. The claims are based on the fact that Mid-Continent's insured supplied defective concrete to Lauger, which Lauger then incorporated into a building before discovering the defect. When it did so, Lauger had to spend $158,046.14 to demolish the building and replace the foundation.

### Facts

M.W. Rentals & Services, Inc. ("MWRS") hired Lauger Companies ("Lauger") to construct a building in Victoria, Texas. Lauger understood MWRS was in the business of renting heavy equipment for use in construction, oil-field work, and other industrial applications, and that the foundation had been designed to be sturdy enough to support the equipment inventory. (Exh. 1, Luke

Zettlemoyer Dec., at ¶ 2.) The foundation design, as supplied to Lauger to follow in constructing the building, called for a portion to be built with concrete having a compressive strength of at least 3,000 pounds per square inch.[1] (*Id.* at ¶ 3.) The concrete was to reach this strength after curing for an industry-standard period of 28 days. (Exh. 1 at ¶ 4.) Lauger purchased the concrete from Cross Roads Industries, Inc. ("CRI"), in several batches on four dates in October, 2012. The purchases were documented on CRI invoices showing the minimum strength (3,000 psi) of the batches that CRI agreed to supply to Lauger. (Exh. 1 at ¶ 5 & Exh. 1 attachments at pp. 1-5.)

Before the concrete was poured on October 12, 2012, Lauger had prepared the ground and installed the piers, prepared molding for the foundation, laid the rebar, installed plumbing and electrical hardware that would become part of the concrete foundation, installed anchor bolts that would become embedded in the concrete foundation and that would be used to attach the steel skeleton of the building to the foundation, and installed hardware that would support a grated covering over a drainage catch basin that was to run down the middle of the

---

[1] Further references to the "foundation" are limited to the portion to be built with 3,000 psi concrete. The design also required rebar reinforcement of the concrete, but the compressive strength was independent of the rebar.

foundation. (*Id.* at ¶ 6.) After the concrete was poured and while it was curing, Lauger proceeded with putting up the building's steel skeleton. Construction did not progress any further because of the evidence that soon emerged of the concrete's low strength. (Exh. 1 at ¶ 7.)

It is normal practice in the commercial construction industry to set aside concrete samples from a pour (or series of pours) and to let them cure in order for the samples to be strength-tested without having to drill cores out of the foundation. (Exh. 1 at ¶ 8.) In this case, Lauger hired T.S.I. Laboratories, Inc. ("TSI Labs"), to collect samples at 50-yard intervals and to conduct the strength testing. (Exh. 1 at ¶ 9.) The testing showed that all samples drawn from the same pours as the foundation had a compressive strength of less than 3,000 psi when measured at three of the industry-standard testing intervals (7, 14 (if indicated by the 7-day results), and 28 days after collection), including on the 28th day, when the Lauger-CRI agreement required the concrete to have attained a strength of at least 3,000 psi. (*Id.* & Exh. 1 attachments at pp. 6-12.) Lauger had also noticed in various locations of the foundation, before the 28th day, flaking or spawling of the concrete to a depth of about 0.10", as well as cracking. (Exh. 1 at ¶ 10.)

The professional engineer who designed the foundation, Christopher J. Korinek, advised Lauger in November 2012 (between the 28-day and 56-day

testing) that the foundation could be made acceptable by pouring an additional 4" to 6" inches of concrete on top of the existing concrete (plus some measures to help ensure a good bond between the two layers). (Exh. 1 at ¶ 11 & Exh. 1 attachments at pp. 13-15.) Before adopting that solution, Lauger instructed TSI Labs to drill cores from the foundation for additional testing to confirm what the non-drilled samples were indicating. Two cores were drilled on December 4, 2012 (*Id.* at ¶ 12 & Exh. 1 attachments at pp. 16-17) , only one of which was tested (on January 3, 2013, at 83 days after pouring); it had a strength of 3,051 psi. (*Id.* & Exh. 1 attachments at pp. 18-19). Twenty-four cores were drilled on January 24, and 16 more on February 12, 2013. (*Id.* & Exh. 1 attachments at pp. 20-23).

These samples were tested by another entity, Terracon Consultants, Inc. ("Terracon"). (*Id.*) Terracon's testing of the cores drilled on January 24, and reported on January 31, showed many of the samples had a compressive strength of less than 3,000 psi (one was only 1,820 psi). (*Id.* at ¶ 13 & Exh. 1 attachments at pp. 24-26.) Terracon's testing of the cores drilled on February 12, and reported on February 19, showed likewise. (*Id.* & Exh. 1 attachments at pp. 27-29.) Mr. Korinek, in an email to Lauger on February 22, 2013, "recommend[ed] a petrographic analysis to determine the cause of the law compressive strength." (Exh. 1 at ¶ 13.)

Lauger commissioned that analysis (from Wiss, Janney, Elstner Associates, Inc.), supplying a 7-inch long core sample and the "concrete mixture design"—the recipe—that CRI had used to make the concrete. (Exh. 1 at ¶ 14 & Exh. 1 attachments at p. 35.) The analysis report, issued on March 12, 2013, noted that the air content in the core sample was 8 percentage points higher than the recipe prescribed, and it concluded: "Based on the studies, the probable cause of [the concrete's] low strength is excessive air content (measured at 12 percent versus the specified value of 4 percent)." (*Id.* & Exh. 1 attachments at p. 37.) The analysis drew no conclusions about how so much air got into the mixture.[2]

---

[2] According to the analysis report, "[h]igh air content may have been caused by an overdose of air-entraining admixture [AEA] or for other reasons not revealed by the petrographic examination." (Exh. 1 attachments at p. 37.) In an email that accompanied the report, one of the report's author's provided these further remarks about the air problem:

> Usually we put the blame on overdose of AEA when the air climbs this high. However, a good portion of the air content in this concrete was irregularly shaped larger air voids that are not typical of the small spherical air voids expected with AEA overdose. It is possible that these misshapen voids resulted from multiple air voids coalescing—but they also might indicate other factors such an [sic] admixture interaction, batching, mixing, re-tempering difficulties, or something else.

(Exh. 1 at ¶ 15 & Exh. 1 attachments at pp. 47-48.) The analysis report clearly described the concrete's defect— excessive air content—but not what caused the defect. Lauger is not aware of any evidence, in the record or elsewhere, that purports to describe what caused the defect. Mid-Continent has not presented any
(continued...)

5

Meanwhile, Lauger's client, MWRS, commissioned a study and advice from National Structural Engineering, Inc. ("the consulting engineers") on what to do with the existing foundation, in light of the data on the concrete's low strength and Mr. Korinek's proposed solution of topping the foundation with more concrete. (Exh. 1 at ¶ 16.) The consulting engineers conducted a site visit on December 21, 2012, and issued a report on January 4, 2013 (before numerous cores were drilled later that month and in February, and before Terracon tested them). The consulting engineers rejected Mr. Korinek's solution, and advised re-starting the project with a new foundation: "[I]t is the engineer's opinion that the 6" inch topping is not a satisfactory method of repair. In addition, the structural integrity of this foundation has been compromised by low compressive strength and spawling concrete. Therefore, the foundation should be removed and replaced." (*Id.* & Exh. 1 attachments at p. 55.)

---

[2](...continued)
evidence that CRI intentionally increased the air content with actual or constructive knowledge that doing so would prevent the concrete from reaching the agreed strength. To the contrary, the underlying litigation between Lauger and CRI was premised in part on negligence. (Exh. 1 at ¶ 22 & Exh. 1 attachments at pp. 174-180.) And while Lauger also sought treble damages for a knowing and intentional violation of the Texas Deceptive Trade Practices Act, treble damages were not awarded, because there was no evidence that CRI provided, with knowledge and intent, the defective concrete. (Exh. 1 at ¶ 22.)

MWRS's attorney then wrote to Lauger (in April 2013, after Terracon's testing and the release of the petrographic analysis report), advising that "testing of the foundation determined that it was not fit for its intended purpose and therefore jeopardized not only the safety of employees, but the value of the building and properties." (Exh. 1 at ¶ 17.) The letter continued:

> I advised Mr. Vanbeveren [a principal of the client] to refuse to accept the concrete and require that the same be removed and a new slab poured that would comply with the contract. Through the testing an engineer determined that the integrity of the building was compromised and therefore the safety of the employees was a potential risk for Mr. Vanbeveren, leaving him no choice but to call for the removal of the concrete and replacement of the same.

(*Id.* & Exh. 1 attachments at pp. 56-57.) Lauger had already decided, based on the petrographic analysis report of March 12, that it would be necessary to tear out and rebuild the foundation (with the exception of the drilled piers). (Exh. 1 at ¶ 18.) It demolished everything it had built (even having to remove some of the sub-slab fill below the defective concrete). Its costs for doing so were the following:

| Element | Monetary Damage |
| --- | --- |
| 1. Core Drilling | $3,963.00 |
| 2. Testing/Structural Engineering | $9,312.64 |
| 3. Take Down Metal Building | $6,536.87 |
| 4. Demolition of Foundation | $19,300.00 |

| | |
|---|---|
| 5. Dirt Work Select Fill[3] | $11,800.00 |
| 6. Replace Anchor Bolts | $1,612.63 |
| 7. Replace Galvanized Angle at Catch Basin[4] | $1,224.31 |
| 8. New Concrete Foundation | |
|    Concrete | $26,339.54 |
|    Other Materials & 3d Party Labor | $57,801.91 |
| 9. Lab Testing | $4,894.00 |
| 10. Plumbing | $2,100.00 |
| 11. Electrical | $4,111.59 |
| 12. Supervision | $6,000.00 |
| 13. Equipment Rental | $1,734.71 |
| 14. Dumpster | $509.81 |
| 14. Sanitary Toilet | $503.38 |
| 16. Misc. Equipment & Supplies | $53.63 |
| 17. Fuel | $248.12 |
| **Total** | **$158,046.14** |

---

[3] This involved excavating a couple feet of the foundation-stabilizing, sub-slab fill that Lauger had installed before pouring concrete for the first foundation. The concrete contaminated the first couple feet of the fill layer, so it had to be removed and replaced.

[4] This was the hardware that supported the grated covering that was to be placed over the drainage catch basin running down the middle of the foundation.

(Exh. 1 at ¶ 19, and Exh. 1 attachments at pp. 58-168.) Some of the expenses summarized above consisted not of charges by third-parties, but of Lauger's own labor. Specifically:

> Take Down Metal Building (3.): All of this amount, $6,537.86, consisted of Lauger's own labor.
>
> Replace Anchor Bolts (6.): Of this amount, $670.85 consisted of Lauger's own labor.
>
> Supervision (12.): All of this amount, $6,000, consisted of Lauger's own labor.

(*Id.* at ¶ 21 & Exh. 1 attachments at pp. 169-73.)

## Procedural History

Lauger sued CRI in state court, then amended to add CRI's insurer, Mid-Continent Casualty Company ("Mid-Continent"), when it became apparent that CRI could not pay a judgment to Lauger. After some procedural maneuvers in state court, which eventually restructured the litigation into, in part, an action by Lauger against Mid-Continent alone, Mid-Continent removed to federal court.[5]

---

[5] When CRI cross-claimed against Mid-Continent, the state court re-aligned CRI as a co-plaintiff against Mid-Continent and severed from one another each plaintiff's claims against Mid-Continent. The severance created complete diversity in the new action between Lauger and Mid-Continent, which removed. Lauger's claim against CRI remained in the state court, and resulted in the final judgment (Exh. 1 at ¶ 22 & Exh. 1 attachments at pp. 1181-83) that gave Lauger standing to sue Mid-Continent.

After motion practice in federal court, Lauger and Mid-Continent jointly stipulated to dismissal without prejudice on December 22, 2014.[6]

Meanwhile, Lauger's state court action against CRI (*see supra* note 5) proceeded to conclusion with a final judgment on October 29, 2015, in favor of Lauger for $162,009.14 in actual damages plus $3,025.00 in attorney's fees. CRI was no longer in business and unable to pay the judgment, so Lauger sued Mid-Continent on January 26, 2016, and attached the state court's final judgment as the primary measure of its damages.[7]

Lauger alleged that CRI's liability to Lauger was covered by Mid-Continent's policy in favor of CRI, that Mid-Continent breached the policy by not indemnifying CRI so it could pay Lauger, and that Mid-Continent owes Lauger its attorney's fees. Mid-Continent removed (Doc. 1) and, as previously noted, the Court set deadlines for the parties' summary judgment motions (Doc. 29).

---

[6] The previous federal action was styled *Cross Roads Industries, Inc., et al. v. Mid-Continent Casualty Company*, No. 6:14-cv-00024.

[7] The discrepancy between the final judgment of $162,009.14 and the damages quantified in Mr. Zettlemoyer's declaration in the amount of $158,046.14 (Exh. 1 at ¶ 19) is due to the erroneous double-counting (in the state-court proceedings) of certain invoices. Mr. Zettlemoyer's declaration states the correct total after elimination of the duplication.

## Argument

### A. Coverage for the Property Damage

An insurer assumes, in a liability insurance policy, two duties: (1) to defend the insured against covered lawsuits and (2) to indemnify the insured against all covered claims and judgments. *D.R. Horton–Tex., Ltd. v. Markel Int'l Ins. Co., Ltd.*, 300 S.W.3d 740, 743 (Tex. 2009). Only the duty to indemnify is at issue in this action. "The insurer's duty to indemnify depends on the facts proven and whether the damages caused by the actions or omissions proven are covered by the terms of the policy." *Id.* at 744.

Mid-Continent's insurance policy in favor of CRI, the concrete supplier, covers "'property damage' ... caused by an 'occurrence' that takes place in the 'coverage territory.'" (Doc. 30 at 2.[8]) The policy defines "property damage" as both "[p]hysical injury to tangible property," and "[l]oss of use of tangible property that is not physically injured." (Doc. 30 at 3.) It defines an "occurrence" as an "accident" (Doc. 30 at 3), but does not define "accident."

The controlling authority on the question of coverage is the Texas Supreme Court's decision in *U.S. Metals, Inc. v. Liberty Mutual Group, Inc.*, 490 S.W.3d 20 (Tex. 2015, reh'g denied 2016). The facts are closely similar to those of this case.

---

[8] Doc. 30 comprises the policy excerpts that the parties identified as relevant to their positions, and filed pursuant to the Court's order. (Doc. 29.)

U.S. Metals sold flanges to ExxonMobil for installation in two refineries. The flanges were "designed to be welded to ... piping" that "operate[d] under extremely high temperatures and pressures." *Id.* at 21-22. Once the flanges were welded into place, they "were covered with a special high temperature coating and insulation." *Id.* at 22. The flanges were supposed to have been "made to meet industry standards," but leakage from some of the flanges triggered an investigation, which "revealed that the flanges did not meet industry standards." *Id.* This, of course, is about the same as what happened with the concrete CRI sold to Lauger: it did not meet the 3,000 psi standard to which they had agreed.

The outcome was also about the same: "ExonMobil decided it was necessary to replace [the flanges] to avoid the risk of fire and explosion." *Id.* But replacing the flanges was no easy matter,[9] just as replacing the concrete foundation was no easy matter for Lauger, as it entailed demolishing the foundation (except the piers) and what had been built on top.

---

[9] For each flange, this process involved stripping the temperature coating and insulation (which were destroyed in the process), cutting the flange out of the pipe, removing the gaskets (which were also destroyed in the process), grinding the pipe surfaces smooth for re-welding, replacing the flange and gaskets, welding the new flange to the pipes, and replacing the temperature coating and insulation.

490 S.W.3d at 28.

The Texas Supreme Court held that ExxonMobil's property ("diesel units") was "not physically injured merely by the installation of U.S. Metals's faulty flanges," but that the diesel units "*were* physically injured in the process of replacing the faulty flanges." *Id.* at 28.[10] In other words, "[t]he fix necessitated injury to tangible property, and the injury was unquestionably physical." *Id.* Further, those repair costs were "covered by the policy unless [an exclusion] applie[d]." *Id.*

After the Texas Supreme Court rendered its opinion, Liberty Mutual petitioned for rehearing on the ground that the holding in favor of coverage was erroneous. Its petition argued that the damage-causing repairs were intentional, not accidental, but the policy required a covered occurrence to be accidental, so there was no coverage. (Exh. 2.) The Texas Supreme Court denied the petition. The policy at issue here also requires an accidental occurrence to trigger coverage, and this Court should follow the Texas Supreme Court's refusal to be distracted by that issue. Demolition of the unfinished MWRS building was intentional, not

---

[10] Because the flanges were welded to pipes rather than being screwed on, the faulty flanges had to be cut out, pipe edges resurfaced, and new flanges welded in. The original welds, coating, insulation, and gaskets were destroyed in the process and had to be replaced.

*Id.*

13

accidental, but Mid-Continent's policy does not define "accident," and the common and ordinary meaning[11] of "accident" is expansive enough to accommodate the idea that an accident—the excessive air content of the cement—was the root cause of the events that led to the demolition.

"If the insured proves coverage, then to avoid liability the insurer must prove the loss is within an exclusion." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010). Lauger will not try to argue here in anticipation of Mid-Continent's burden of proving an exclusion. Instead, it will reserve these topics for its response to Mid-Continent's cross-motion and/or its reply to Mid-Continent's response to this motion, in line with the principle that "[i]f the insurer proves that an exclusion applies, the burden shifts back to the insured to show that an exception to the exclusion brings the claim back within coverage." *Id.* At *this* point, until Mid-Continent satisfies its burden, coverage applies to all the categories of expenses that Lauger incurred in demolishing and rebuilding, *i.e.*, in fixing the problems that resulted from the defective concrete

---

[11] *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005) ("[c]ontract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense"); *Houston Cas. Co. v. Anadarko Petroleum Corp.*, 2016 WL 6809215, at *8 (Tex. App.-Beaumont Nov. 17, 2016, no. pet. h.) ("[t]he Policy does not define 'whole' but we give it its ordinary meaning"); *Cantu v. S. Ins. Co.*, 2015 WL 5096858, at *6 (Tex. App.-Austin Aug. 25, 2015, no pet.) ("[t]he policy does not define 'itemize,' so we look to its ordinary meaning").

supplied by Mid-Continent's insured, which are cited above and itemized in the supporting evidence. (Exh. 1 at ¶¶ 19-21.)

### B. Attorney's Fees and Costs

Lauger's removed state-court petition sought attorney's fees under TEX. CIV. PRAC. & REM. CODE Chapter 38. More specifically, the claim arises under § 38.001(8), which allows for recovery of fees and costs by a prevailing party on a claim that involves "an oral or written contract."[12] Texas case law recognizes that an insurer's breach of an insurance contract may give rise to liability under § 38.001(8).[13] Further, when a damaged party obtains a judgment against an insured, the damaged party becomes a third-party judgment creditor of the insurer whose policy covers the damage. "Third party judgment creditors step into the shoes of the insured, and are bound by the rights, duties, and obligations of the insured according to the terms of the insurance contract between the insurance

---

[12] Lauger also sought fees under TEX. BUS. & COM. CODE § 17.50(d). That provision allows fees and costs for prevailing in a claim under the Deceptive Trade Practices Act, which was not alleged against Mid-Continent. Therefore, Lauger does not base this motion on § 17.50(d).

[13] "We hold that in a policyholder's successful suit for breach of contract against an insurer that is subject to the provisions listed in section 38.006, the insurer is liable for reasonable attorney's fees incurred in pursuing the breach-of-contract action under section 38.001 unless the insurer is liable for attorney's fees under another statutory scheme." *Grapevine Excavation, Inc. v. Maryland Lloyds*, 35 S.W.3d 1, 5 (Tex. 2000).

15

company and the insured." *Huntington Operating Corp. v. Sybonney Exp., Inc.*, 2009 WL 2423811, at *2 (S.D. Tex. Aug. 3, 2009) (citing *P.G. Bell Co. v. U.S. Fid. & Guar. Co.*, 853 S.W.2d 187, 189 (Tex.App.-Corpus Christi 1993, no writ)). Therefore, Lauger can recover the fees and costs it has incurred since obtaining the state court's final judgment against CRI on October 29, 2015, to litigate Mid-Continent's coverage of the property damage.

Those fees and costs (respectively, $17,887.50 and $1,250.28) are detailed on Lauger's counsel's invoice (Exh. 3, Declaration of David C. Griffin & attached invoice; *see also* Exh. 4, Declaration of Robert E. McKnight, Jr.). Declarations from two other attorneys who practice in the Victoria legal market and who are familiar with hourly rates in that market are also attached in support of the hourly rates that are claimed in this motion for the work of Lauger's counsel. (Exh. 5, Declaration of Kevin D. Cullen; Exh. 6, Declaration of David Roberts).

## **Conclusion**

The Court should rule grant summary judgment in favor of Lauger Companies, Inc., in the amount of $158,046.14, plus reasonable attorney's fees and costs in the total amount of $19,137.78.

        Respectfully submitted,

        MAREK, GRIFFIN & KNAUPP

        By: /s/ Robert E. McKnight, Jr.
            Robert E. McKnight, Jr.
            SBN 24051839
            David C. Griffin*
            SBN 08456950
            203 N. Liberty Street
            Victoria, Texas 77901
            Telephone: (361) 573-5500
            Facsimile: (361) 573-5040

        * Attorney in charge

        Attorneys for Lauger Companies, Inc.

### Certificate of Service

I hereby certify that on January 13, 2017, I served the foregoing on the following through the Court's CM/ECF system:

R. Brent Cooper
brent.cooper@cooperscully.com
Robert J. Witmeyer
rob.witmeyer@cooperscully.com
Cooper & Scully, P.C.
Founders Square
900 Jackson Street, Suite 100
Dallas, TX   75202


        s/ Robert E. McKnight, Jr.
        Robert E. McKnight, Jr.